# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CAROLYN CHAVEZ,**

    **Plaintiff,**

**-vs-**                                                    **Case No. 6:10-cv-1524-Orl-28DAB**

**URS FEDERAL TECHNICAL SERVICES, INC.,**

    **Defendant.**

_____

## ORDER

Plaintiff, Carolyn Chavez ("Plaintiff"), brings this action against her former employer, URS Federal Technical Services, Inc. ("URS"), alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et seq.</u> ("Title VII") and the Florida Civil Rights Act of 1992, sections 509.092, 760.01-.11, Florida Statutes ("the FCRA"). Specifically, Plaintiff claims that URS terminated her employment because of her gender.

The case is currently before the Court on URS's Motion for Summary Judgment (Doc. 14). Upon consideration of the record and pertinent law, the Court concludes that URS's motion must be granted.

### I. Background

URS, a government contractor, was awarded the Institutional Services Contract ("ISC") at Kennedy Space Center in June 2008; the ISC went into effect on October 1, 2008. From 1998 to 2008, the services covered by the ISC had been provided by a different

contractor, SGS, under a contract called the Joint Base Operations Support Contract ("J-BOSC").[1]

Plaintiff, who holds bachelor's and master's degrees in business administration, was employed by SGS from 1998 until August 2008. From 1998 until 2007, Plaintiff worked in the Program Management Office at SGS, and in 2007 she was selected for a senior manager position in Launch Readiness by SGS's Director of Launch Readiness, Bill Brennan. After serving in that role for a few months, Plaintiff became Director of Launch Readiness when Brennan left to work for another entity, and she held that position for the rest of her tenure at SGS. (Pl. Dep. at 89). While she served as SGS's Director of Launch Readiness, she promoted a test conductor named Mike Sweeney to a manager position. (Id. at 89-90). As such, Sweeney oversaw the test conductors, the outage coordinators and planners, and the mission schedulers. (Id. at 90).

In anticipation of the ISC, URS considered both Plaintiff and Brennan for the position of Division Manager of Mission Support. Brennan was chosen for that position in July 2008. Brennan then hired Plaintiff as a branch manager in his division in August 2008.[2] That position had originally been bid and designated as a "Supervisor II" position, but at Brennan's

---

[1]The J-BOSC had encompassed both Kennedy Space Center and Cape Canaveral Air Force Station, but the ISC pertained only to Kennedy Space Center. (Pl. Dep. at 29). Thus, the J-BOSC was more inclusive than the ISC.

[2]Plaintiff accepted URS's job offer on August 28, 2008 but did not begin full-time employment with URS until October 1, 2008. (See Ex. 4 to Pl. Dep.). Because SGS was not awarded the ISC, Plaintiff's job at SGS would have been nonexistent when the J-BOSC ended. SGS had bid for the ISC but did not include Plaintiff as its launch director in its proposal; instead, SGS intended to bring in a male launch director from elsewhere if it was awarded the ISC. (Pl. Dep. at 112-13).

-2-

request it had been changed to a branch manager job—a position that typically would pay more than "Supervisor II" and would give the holder of that position peer status with other branch managers. (Id. at 117-24; Brennan Dep. at 34-35; Ex. 3 to Pl. Dep.). Plaintiff was the only branch manager who reported to Brennan. (Brennan Dep. at 19).

Together, Brennan and Plaintiff interviewed and hired employees for their department at URS, including test conductors and duty officers. (Pl. Dep. at 125). They also interviewed Sweeney for an engineer position and hired him, but his job duties consisted of helping Plaintiff with the day-to-day operation of the Duty Office and Mission Support office. (Id. at 125-26). Sweeney's duties included calling out overtime, directing the employees' activities, and signing time cards. (Id. at 126). There were eighteen employees in the areas managed by Plaintiff. As described by Plaintiff, "on paper" she was the supervisor of these employees but Sweeney also had supervisory duties over them. She estimated that sixty percent of the time the employees looked to Sweeney for supervision and the other forty percent of the time they looked to her. (Id. at 34-37).

URS's program manager, Kurt Bush, was one level above Brennan and two levels above Plaintiff. On at least two occasions, Bush accused Plaintiff of "not being a team player." In one incident, Plaintiff was participating in an "all-hands safety meeting" telephone call one morning along with all of the division managers, all of the branch managers, Bush, and others. During that telephone call, Plaintiff stated, "You really need to schedule the safety meetings appropriately, because we're in launch countdown mode . . . and we just wasted a lot of people's time . . . ." (Id. at 56). Bush later pulled Plaintiff aside and told her she was not a team player and that if she ever did anything like that again she would not be

employed. (Id. at 56-57). The other occasion involved Plaintiff rewriting procedures for Launch Readiness and another department making changes to Plaintiff's work. Plaintiff and the other department kept sending the procedures back and forth, and Bush regarded Plaintiff as uncooperative and not a team player. (Id. at 62-64).

On August 21, 2009, Plaintiff was laid off. URS's HR representative, Lester Jordan, told Plaintiff that day that there were no issues with her performance but that there had been a series of budget reductions and that Bush had "a vendetta" against her. (Id. at 140). Jordan then turned to Brennan, who was present as Jordan delivered the news to Plaintiff,[3] and told him: "And you ought to be lucky that you have a job, because you're right out the gate, right behind her." (Id.). Plaintiff was offered another position that paid $30,000 less, but she but she regarded that offer as "a slap in the face" and never considered accepting it. (Id. at 143-44).[4]

Plaintiff and Brennan had been aware of URS's budget issues and had even discussed ways to possibly cut costs in their department if they were asked to do so. (Id. at 131-35; Brennan Dep. at 22). Their department did not order supplies, and the only way to cut costs would have been to eliminate one or more employees. (Pl. Dep. at 133). The same day that Plaintiff was laid off, eight other employees were also laid off—all from other departments—including one female branch manager and one male branch manager. (See

---

[3]Brennan had learned from Bush the day before that Plaintiff was going to be laid off. (Brennan Dep. at 26). Brennan tried to persuade Bush to keep Plaintiff and make cuts elsewhere, but Bush did not change his mind about laying off Plaintiff. (Id. at 26-28).

[4]Plaintiff was also offered thirteen weeks' severance pay—$26,000—but it is not clear whether Plaintiff accepted this severance pay. (Pl. Dep. at 142-43).

-4-

Ex. 5 to Pl. Dep.). Brennan was moved to another position—Program Transition Manager[5]—and Sweeney absorbed Plaintiff's job duties and began reporting to the division manager of the Facilities Division.

Plaintiff filed this lawsuit in state court in August 2010, and it was removed to this Court in October 2010. (Docs. 1 & 2). URS's summary judgment motion is now ripe for ruling.

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely

---

[5]Brennan explained in his deposition that Bush told him that URS was "going out of the launch business" and accordingly Bush was downsizing as URS moved toward the closeout of the space shuttle program. (Brennan Dep. at 14).

colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1263 (quoting Anderson, 477 U.S. at 251-52); see also Laroche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). "[T]he summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

### III. Discussion

Title VII provides in part that an employer may not discharge or otherwise discriminate against an employee because of that employee's sex. 42 U.S.C. § 2000e-2(a)(1).[6] "On any Title VII claim the plaintiff bears 'the ultimate burden of proving discriminatory treatment by

---

[6]The FCRA proscribes such practices as well. See § 760.10(1)(a), Fla. Stat. The FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework as Title VII claims; thus, the outcomes of Plaintiff's two counts are the same, and Plaintiff's FCRA claim need not be separately discussed. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010).

a preponderance of the evidence.'" Crawford v. Carroll, 529 F.3d 961, 975 (11th Cir. 2008) (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)). Because Plaintiff has not presented any direct evidence of discrimination, the Court evaluates her claim using the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to determine if Plaintiff can establish her claim through circumstantial evidence. See, e.g., EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. . . . Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims.").

Under this three-part framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

If the plaintiff presents a prima facie case and its attendant presumption, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "If the defendant articulates one

or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

### A. Prima Facie Case

Case law has produced many different articulations of the elements of a Title VII plaintiff's prima facie case. The elements are to be flexibly rather than rigidly applied, and the formulations of these elements depend on the type of case and the pertinent facts. See, e.g., Carter v. City of Miami, 870 F.2d 578, 582 & 583 nn.12 & 14 (11th Cir. 1989) (noting variation in prima facie elements and that "[t]he Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment"). A plaintiff may establish a prima facie case of discriminatory termination in the reduction-in-force ("RIF") context by showing: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she was terminated; and (4) that a similarly-situated male was retained. In re Carnegie Ctr. Assocs., 129 F.3d 290, 294-95 (3d Cir. 1997).

Plaintiff has satisfied each of these elements. She is female; she was qualified for the job she was performing; she was terminated; and several male managers were retained during the RIF. The two other managers in her department—Brennan and Sweeney—were retained, with Sweeney absorbing Plaintiff's job functions after she was laid off, and Plaintiff

has also provided evidence of male branch managers in other departments who were retained. Thus, using either of these groups as appropriate comparators, the fourth element has been satisfied, and Plaintiff has met her burden of presenting a prima facie case of discrimination.

### B. Pretext

In response to Plaintiff's prima facie case, URS has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff—that Plaintiff, like eight other URS employees, was part of a companywide RIF that was brought on by a need to cut the budget. Thus, URS is entitled to summary judgment unless Plaintiff presents evidence creating a genuine issue of material fact regarding whether URS's selection of Plaintiff as part of the RIF was a mere pretext for discrimination. See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs, 106 F.3d at 1538 (citation and internal quotation omitted). This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence.'" Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)). "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield, 115 F.3d at 1565.

Applying these standards, Plaintiff has failed to present evidence creating a genuine issue of material fact regarding whether URS's reason for its action was a pretext for gender discrimination. See Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding no issue raised as to pretext where evidence presented did "not provide the needed 'more than a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in the evidence as to [the employer's] purported reason for terminating [the plaintiff], the RIF, as to support a jury question"). Plaintiff argues that the budgetary justification is false, but Plaintiff acknowledged in her deposition that she was aware of a significant budget shortfall[7] and that Bush was looking for ways to cut costs. She and Brennan had even discussed ways to cut costs in their department if necessary. (Pl. Dep. at 135).

In light of the evidence of a need for budget cuts and the layoff of eight other employees in addition to herself, Plaintiff argues that Sweeney—not she—should have been laid off, and she asserts that "alternatives better than firing [Plaintiff] existed to reduce the budget of [Plaintiff's] division." (Doc. 16 at 17). She complains that she was "not even offer[ed] . . . a pay cut to stay in her position" and that Sweeney now—over two years

---

[7]Plaintiff thought that the budget shortfall was $1-2 million rather than $3.3-5 million. (Pl. Dep. at 134).

later—makes almost as much as she was making at the time she was laid off. (Id.). Further, she argues that she had no "performance issues."

Plaintiff's arguments miss the mark. She essentially asks this Court to second-guess the business decisions of URS in implementing a RIF. It is not the province of the Court to question the difficult decisions made by an employer in reducing its workforce for budgetary reasons absent some indication of unlawful discrimination—an indication which is absent from the record in this case. The record evidence reflects that Plaintiff's department was not bid–and therefore not funded—by the initial contract; that Brennan elevated the position for which Plaintiff was hired from "Supervisor II" to branch manager; that Plaintiff hired Sweeney as an engineer who then assisted her with her managerial duties, with the result that there were three managers for eighteen hourly employees; that the hourly employees, by Plaintiff's own acknowledgment, reported to Sweeney more than to her; that Sweeney was being paid approximately $40,000 less than Plaintiff at the time of the layoffs[8]; that the department no longer exists as it did and the employees now report to another division; and that on at least two occasions the project manager, Bush, had perceived Plaintiff as a "non-team player," including one instance in which Plaintiff questioned the scheduling of a meeting in front of all the branch managers and division managers.

In the face of this evidence, Plaintiff's questioning of the decision to lay her off rather than another employee is unavailing. "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason,

---

[8](See Sweeney Dep. at 11; Pl. Dep. at 124).

at least not where, as here, the reason is one that might motivate a reasonable employer." Combs, 106 F.3d at 1543. Although Plaintiff may think that URS made a poor decision in laying her off as a partial solution to its budget problems, it is URS's prerogative to make such choices. The Eleventh Circuit has emphasized that "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).

Plaintiff's assertions of gender bias in connection with her termination are belied by her own deposition testimony. Plaintiff testified that Bush preferred certain female managers over others and certain male managers over others. (Pl. Dep. at 73-75, 141-42). She also testified that Bush did not like her male boss, Brennan. In fact, when the HR representative terminated her in Brennan's presence, he told Plaintiff that Bush did not like her and told Brennan that he was lucky he still had a job because Bush did not like him either. Title VII does not protect employees from being disliked by their superiors; it protects them from conduct driven by a class-based animus. The evidence in this case may show that Bush preferred some employees over others, but by Plaintiff's own account those preferences were not gender-based. In sum, Plaintiff's attempts to attribute her termination to

discriminatory motives are purely speculative.[9]  See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 70 (1st Cir. 2002) (affirming summary judgment for employer, noting that the "proffered reasons for [the plaintiff's] termination are plausible and coherent, and neither [the plaintiff's] criticisms of those reasons nor her independent circumstantial evidence of an improper motive, whether taken apart or together, are sufficient to require a jury trial").  Accordingly, URS's motion for summary judgment shall be granted as to both of Plaintiff's claims.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  URS's Motion for Summary Judgment (Doc. 14) is **GRANTED**.

2.  Any other pending motions are **DENIED as moot**.

3. The Clerk is directed to enter a judgment providing that Plaintiff takes nothing from URS on her claims.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 27th day of January, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

---

[9]Plaintiff's argument regarding the number of female managers who were laid off as compared, proportionately, to the number of male managers who were terminated also fails to create an issue as to pretext.